CALEB MARKER (SBN 269721)
caleb.marker@zimmreed.com
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, California 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

BRIAN C. GUDMUNDSON (*pro hac vice*)
brian.gudmundson@zimmreed.com
RACHEL K. TACK (*pro hac vice*)
rachel.tack@zimmreed.com
MICHAEL J. LAIRD (*pro hac vice*)
michael.laird@zimmreed.com
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0400

*Attorneys For Plaintiff and Putative Class*
(additional attorneys listed on signature page)

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KHUSCHBU DIDWANIA, PRATIKKUMAR PATEL, and BENJAMIN ADAMS, | Case No. 2:23-cv-05110 |
| | **COMPLAINT – CLASS ACTION** |
| Plaintiffs, | 1. Breach of Express Warranty |
| v. | 2. Negligent Misrepresentation |
| | 3. Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. |
| HEXCLAD COOKWARE, INC. | 4. Violation of the California False Advertising Law, California Business and Professions Code § 17500, *et seq*. |
| Defendant. | 5. Violation of the California Unfair Competition Law, California Business and Professions Code § 17200, *et seq*. |
| | 6. Unjust Enrichment |
| | (Plaintiffs Demand Trial by Jury) |

Plaintiffs Khushbu Didwania, Pratikkumar Patel, and Benjamin Adams ("Plaintiffs"), by and through their attorneys of record, upon personal knowledge as to their own acts and experiences, and upon the investigation of counsel and information and belief as to other matters, file this complaint against HexClad Cookware, Inc. ("HexClad" or "Defendant") and allege the following:

## INTRODUCTION

1.       This is a proposed class action against HexClad for misleading consumers through its marketing related to HexClad cookware products, including claims related to the cookware being "non-toxic" or "free from" certain chemicals.

2.       In recent years, consumers have become increasingly concerned about using products that are cleaner and safer for humans, animals, and the environment. As a result, consumers are demanding products that are made from more natural ingredients and are environmentally sounder, including products that cause less harm to the environment through the product's materials, manufacture, use, or disposal.  Indeed, consumers have poured billions of dollars into the "ecofriendly" and "natural" products market.[1]

3.       In a recent report, researchers found that members of "Generation Z" (people born between roughly 1996 and 2010) are more likely to spend money on companies and brands seen to be environmentally ethical.[2]     Another report, Nielson's Global Corporate Sustainability Report, found that 66% of consumers would spend more on a product if it comes from a sustainable brand, and that jumps to 73% among millennials.  Therefore, companies have a financial incentive to be more environmentally conscious, or at least appear to be.[3]

---

[1] https://www.foodbusinessnews.net/articles/13133-sustainable-product-market-could-hit-150-billion-in-us-by-2021
[2] https://earth.org/what-is-greenwashing/.
[3] *Id.*

4.      This consumer movement toward environmentally friendly and safe products is generally called the "green" movement.   Some companies, like Defendant, deceptively market their products as environmentally friendly and free from harmful chemicals to profit off this growing green movement without *actually* going green.  This is known as "greenwashing." "Greenwashing" generally describes the act of companies misleading consumers regarding the company's environmental practices or the environmental/health benefits of its products or services. Greenwashers do not make notable efforts toward an environmentally friendly marketplace, certainly not to the extent that they frequently claim.[4]

5.      HexClad Cookware claims that their products are free from PFOA and PFAS "forever chemicals" while also admitting they are coated with polytetrafluoroethylene (PTFE) and marketing PTFE as safe and inert.  The PTFE compound found in the non-stick coating of HexClad Cookware is a fluoropolymer plastic compound that is silicone based and contains both carbon and fluorine. [5]

6.      According to the State of California, where HexClad is headquartered, and laws therein, PTFE is a type of PFAS chemical.  It is therefore misleading for HexClad to represent to consumers that its cookware is free from PFOAs and all PFAS.  Additionally, pursuant to the California Safer Food Packaging & Cookware Act of 2021, cookware sold in California is restricted from making certain "chemical-free" claims in promoting their cookware.

7.      Thus, in addition to being deceptive and misleading HexClad's "free from" claims violate California law. [6]

---

[4] https://www.businessnewsdaily.com/10946-greenwashing.html.
[5] https://www.stonefryingpans.com/non-stick-frying-pan-health-risks/.
[6] *California Requires New Cookware Chemical Labeling Requirements by January 1st*, JDSUPRA, Nov. 30, 2022, https://www.jdsupra.com/legalnews/california-requires-new-cookware-2459164/ (last visited June 1, 2023)

COMPLAINT

8.     Unfortunately for consumers, there are health concerns surrounding PFOA because it stays in the human body, as well as in the environment, for significant periods of time.  Health studies on PFOA indicate that people who have been exposed to the chemical are more at risk for endocrine disruption, cancer, thyroid disease, bladder, kidney, and testicular cancer, liver damage and disease, and colitis.  When PFOA is used in making non-stick cookware, it can be a significant health risk over time, particularly because the non-stick coating burns off during the cooking process, becoming a toxic pollutant that may make its way into food or into the air we breathe.  PFOA is used in the process of making PTFE. [7]

9.     On October 26, 2022, Consumer Reports ("CR") published a report from a test it conducted on several purported "non-toxic" cookware.  It tested three nonstick pans that all claimed to be free from PFAS, including the coatings on the Swiss Diamond, Always, and Red Copper nonstick frying pans to see if they were really free from PFAS chemicals.[8]  The Swiss Diamond pan had a PTFE coating and was said to be PFOA-free and used PTFE in its non-stick coating, identical or substantively similar to HexClad's cookware.

10.    The CR test revealed that the PFTE coated Swiss Diamond pan had measurable amounts of PFOA and several other PFAS. Specifically, the Swiss Diamond pan had measurable levels of 16 of the 96 PFAS included in the test and 4 parts per billion (ppb) of PFOA in the PFTE coating, even though the package said

---

[7] *Id; see also* Kyle Bagentose, *What are PFAS? A guide to understanding chemicals behind nonstick pans, cancer fears*, Mar. 7, 2022, https://www.usatoday.com/story/news/2022/03/07/pfas-guide-chemicals/6652847001/ (last visited June 20, 2023).

[8] Kevin Loria, *You Can't Always Trust Claims on 'Non-Toxic' Cookware*, CONSUMER REPORTS, Oct. 26, 2022, https://www.consumerreports.org/toxic-chemicals-substances/you-cant-always-trust-claims-on-non-toxic-cookware-a4849321487/ (last visited May 25, 2023).

it was PFOA-free.

11.     CR further concluded that PFOA-free should not be displayed on non-stick cookware containing a PTFE coating, because that claim is unreliable and also, consumers looking to avoid PFAS in cookware should look for products that claim to be "PTFE free".[9]

12.     HexClad claims its cookware is "non-toxic" and "free from PFOAs" and PFAS, but the cookware has a PTFE non-stick coating just like the Swiss Diamond pan.  This claim misleads consumers into thinking the HexClad Cookware is certainly free from all PFAS and PFOAs when this is highly unlikely, and in fact related studies have concluded such claims to be unreliable.

13.     Plaintiffs individually and on behalf of a class of similarly situated individuals, bring this class action to end Defendant's deceptive practice and to recover damages from Defendant's deception.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between plaintiffs, who, as alleged below, are citizens of different states than Defendant.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(1) and (2).  Defendant is headquartered in this District and substantial acts in furtherance of the alleged improper conduct occurred within this District.

## PARTIES

**Plaintiff Khushbu Didwania's Experience**

16.     Plaintiff Didwania is a resident of Fremont, California.

17.     Plaintiff Didwania purchased the HexClad 12-inch Hybrid Wok Pan in

---

[9] *Id.*

or around September of 2022 through Defendant's listings on Amazon.com.

18.   As described herein, Defendant represented to Plaintiff that this product was a non-toxic, metal-utensil safe, hybrid non-stick pan.

19.   Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the pan was non-toxic and free from harmful substances, such as PFOA and other PFAS chemicals.

20.   Had Plaintiff known the HexClad product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOA and other PFAS chemicals, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Pratikkumar Patel's Experience**

21.   Plaintiff Patel is a resident of Bellevue, Washington.

22.   Plaintiff Patel purchased the HexClad 10-inch Hybrid Pan in or around August of 2022 through Defendant's listings on Amazon.com.

23.   As described herein, Defendant represented to Plaintiff that this product was a non-toxic, metal-utensil safe, hybrid non-stick pan.

24.   Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the pan was non-toxic and free from harmful substances, such as PFOA and other PFAS chemicals.

25.   Had Plaintiff known the HexClad product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOA and other PFAS chemicals, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Plaintiff Benjamin Adams' Experience**

26.   Plaintiff Adams is a resident of Union, New Jersey.

27.     Plaintiff Adams purchased the HexClad 12-inch Hybrid Pan in or around April of 2023 through Defendant's website.

28.     As described herein, Defendant represented to Plaintiff that this product was a non-toxic, metal-utensil safe, hybrid non-stick pan. HexClad describes the coating on this pan as "high-grade non-toxic Japanese coating infused with diamond dust for extra toughness."[10]

29.     Plaintiff trusted and relied upon the representations made by Defendant, as described herein, when purchasing this product, including but without limitation, that the pan was non-toxic and free from harmful substances, such as PFOA and other PFAS chemicals.

30.     Had Plaintiff known the HexClad product purchased did not conform to Defendant's representations that it was non-toxic and free from harmful substances, such as PFOA and other PFAS chemicals, Plaintiff would not have purchased the product or would have paid significantly less for it.

**Defendant**

31.     Defendant HexClad is a citizen of California, with its headquarters located at 500 S. Anderson Street, Los Angeles, California 90033.  HexClad sells its products both online, including directly from its website, www.hexcladcookware.com, and through online retailers like Amazon or Walmart. Defendant offers a variety of products, including individual pans and woks, cookware sets, and knives.  HexClad markets its pans, woks and cookware as "non-toxic and "free from" certain chemicals including PFOA and PFAS.

## FACTUAL ALLEGATIONS

**A.     The Green Movement and Greenwashing**

32.     In recent years, consumers have become significantly more aware and

---

[10] https://hexclad.com/products/memorial-day-bundle.

COMPLAINT

sensitive to their impact on the environment and their own health and safety through the products they purchase and use. As a result, a movement has developed demanding consumer products that contain natural ingredients and are environmentally sound, i.e. that do not harm the environment through the product's ingredients, manufacture, use, or disposal. The term "Green" is commonly used to describe these products, and the environmental movement that led to them.

33. In response to consumers' desire for safe, clean, and natural products, many companies "greenwash" their products by deceptively claiming that their products are safer or cleaner than they are. Rather than creating the safe, clean, non-toxic products that consumers desire, many companies have chosen to "greenwash" their products through deceptive labeling, suggesting and outright stating that their products are safe, clean, or natural when, in fact, they contain ingredients that are harmful to humans, animals, and/or the environment, or are otherwise not clean products.

34. Greenwashing is the "activities by a company or an organization that are intended to make people think that it is concerned about the environment, even if its real business practice actually harms the environment." Oxford English Dictionary.

35. Environmentalist Jay Westerveld coined the term "greenwashing" in 1986, in a critical essay inspired by the irony of the "save the towel" movement in hotels that had little impact beyond saving hotels money in laundry costs, and those same hotels were simultaneously tearing down forests for new properties. The idea emerged in a period when most consumers received their news primarily from television, radio, and print media, so they couldn't fact-check the way they could today via the internet.

36. Companies that have engaged in greenwashing on a wide scale have made headlines over the years. In the mid-'80s, for example, oil company Chevron

commissioned a series of expensive television and print ads to broadcast its environmental dedication. But while the now-infamous "People Do" campaign ran, Chevron was actively violating the Clean Air Act and Clean Water Act, as well as spilling oil into wildlife refuges.

37.     Chevron was far from the only corporation making outrageous claims, unfortunately. In 1991, chemical company DuPont announced its double-hulled oil tankers with ads featuring marine animals prancing in chorus to Beethoven's "Ode to Joy." It turned out the company was the largest corporate polluter in the U.S. that year.

38.     Unfortunately for consumers, false claims of environmental soundness have grown along with the demand for green products. In a released study, the environmental consulting group TerraChoice Environmental Marketing found that 98% of more than 2,000 products it surveyed in North America made false and misleading environmental claims by committing one or more of what it classified as the "Seven Sins of Greenwashing"[11]:

      a.      <u>The Sin of the Hidden Trade-off</u> – committed by suggesting a product is "green" based on an unreasonably narrow set of attributes without attention to other important environmental issues;

      b.      <u>The Sin of No Proof</u> – committed by an environmental claim that cannot be substantiated by easily accessible supporting information or by a reliable third-party certification;

      c.      <u>The Sin of Vagueness</u> – committed by every claim that is so poorly defined or broad that its real meaning is likely to be misunderstood by the consumer;

---

[11] http://sinsofgreenwashing.org/.

COMPLAINT

d.   <u>The Sin of Irrelevance</u> – committed by making an environmental claim that may be truthful but is unimportant or unhelpful for consumers seeking environmentally preferable products;

e.   <u>The Sin of Lesser of Two Evils</u> – committed by claims that may be true within the product category but that risk distracting the consumer from the greater environmental impacts of the category as a whole;

f.   <u>The Sin of Fibbing</u> – committed by making environmental claims that are simply false; and

g.   <u>The Sin of Worshipping False Labels</u> – committed by a product that, through either words or images, gives the impression of third-party endorsement where no such endorsement actually exists or fake labels. [12]

39.   Recent data shows that many fashion brands and textile retailers, particularly, are guilty of greenwashing and exaggerating their sustainability credentials without disclosing supporting evidence. [13]

40.   To put it plainly, corporate good is in these days and corporations, like Defendant, will do whatever it takes, even in some cases participate in greenwashing or other forms of related deception to consumers, to appear environmentally conscious, safe, and clean.  Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid

_____

[12] Paul Des Marais, "Decoding 20 Common Green Packaging Symbols," ZENPACK, Dec. 7, 2020, https://www.zenpack.us/blog/decoding-20-common-green-packaging-symbols/ (Mar. 21, 2023).
[13] Fashion Transparency Index 2022 Edition, FASHION REVOLUTION, https://issuu.com/fashionrevolution/docs/fti_2022 (Mar. 21, 2023).

making misleading and deceptive claims.[14]

**B.    FTC Regulation of Greenwashing and the Green Guides**

41.    Section 5 of the FTC Act prohibits deceptive acts and practices in or affecting commerce.   A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers' decisions.  See FTC Policy Statement on Deception, 103 FTC 174 (1983).

42.    In the context of environmental marketing claims, a reasonable basis often requires competent and reliable scientific evidence.  Such evidence consists of tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results.  Such evidence should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered considering the entire body of relevant and reliable scientific evidence, to substantiate that each of the marketing claims is true. [15]

43.    According to the FTC, the following general principles apply to environmental marketing claims.[16]

        a.    <u>Qualifications and Disclosures</u>: To prevent deceptive claims, qualifications and disclosures should be clear, prominent, and understandable.   To make disclosures clear and prominent, marketers should use plain language and sufficiently large type, should place disclosures in close proximity to the qualified claim,

---

[14] *See generally* 16 C.F.R. § 260—Guide for the User of Environmental Marketing Claims.

[15] Part 260—Guides for the Use of Environmental Marketing Claims, FTC, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguides.pdf, (Mar. 21, 2023).

[16] 16 C.F.R. § 260.3.

COMPLAINT

and should avoid making inconsistent statements or using distracting elements that could undercut or contradict the disclosure.

b.  <u>Distinction Between Benefits of Product, Package, and Service</u>: Unless it is clear from the context, an environmental marketing claim should specify whether it refers to the product, the product's packaging, a service, or just to a portion of the product, package, or service.  In general, if the environmental attribute applies to all but minor, incidental components of a product or package, the marketer need not qualify the claim to identify that fact.  However, there may be exceptions to this general principle. For example, if a marketer makes an unqualified recyclable claim, and the presence of the incidental component significantly limits the ability to recycle the product, the claim would be deceptive.

    i.  Example: A plastic package containing a new shower curtain is labeled "recyclable" without further elaboration. Because the context of the claim does not make clear whether it refers to the plastic package or the shower curtain, the claim is deceptive if any part of either the package or the curtain, other than minor, incidental components, cannot be recycled.

c.  <u>Overstatement of Environmental Attribute</u>: An environmental marketing claim should not overstate, directly or by implication, an environmental attribute or benefit.  Marketers should not state or imply environmental benefits if the benefits are negligible.

    i.  Example: A trash bag is labeled "recyclable" without qualification. Because trash bags ordinarily are not separated from other trash at the landfill or incinerator for recycling, they are highly unlikely to be used again for any purpose.  Even if the bag is technically capable of being recycled, the claim is deceptive since it asserts an environmental benefit where no meaningful benefit exists.

d. <u>Comparative Claims</u>: Comparative environmental marketing claims should be clear to avoid consumer confusion about the comparison. Marketers should have substantiation for the comparison.

  i. Example: An advertiser notes that its glass bathroom tiles contain "20% more recycled content." Depending on the context, the claim could be a comparison either to the advertiser's immediately preceding product or to its competitors' products. The advertiser should have substantiation for both interpretations. Otherwise, the advertiser should make the basis for comparison clear, for example, by saying "20% more recycled content than our previous bathroom tiles."

e. <u>Certifications and Seals of Approval</u>: It is deceptive to misrepresent, directly or by implication, that a product, package, or service has been endorsed or certified by an independent third party. A marketer's use of an environmental certification or seal of approval likely conveys that the product offers a general environmental benefit (see § 260.4) if the certification or seal does not convey the basis for the certification or seal, either through the name or some other means.

  i. Example: An advertisement for paint features a "GreenLogo" seal and the statement "GreenLogo for Environmental Excellence." This advertisement likely conveys that: (1) the GreenLogo seal is awarded by an independent, third-party certifier with appropriate expertise in evaluating the environmental attributes of paint; and (2) the product has far-reaching environmental benefits. If the paint manufacturer awarded the seal to its own product, and no independent, third-party certifier objectively evaluated the paint using independent standards, the claim would be deceptive.

f. <u>Biodegradable Claims:</u> It is deceptive to misrepresent, directly or by implication, that a product or package is degradable, biodegradable, oxo-degradable, oxo-biodegradable, or

13

COMPLAINT

photodegradable.  A marketer making an unqualified degradable claim should have competent and reliable scientific evidence that the entire item will completely break down and return to nature within a reasonably short period of time after customary disposal.

   i.  Example: A marketer advertises its trash bags using an unqualified "degradable" claim.  The marketer relies on soil burial tests to show that the product will decompose in the presence of water and oxygen.  Consumers, however, place trash bags into the solid waste stream, which customarily terminates in incineration facilities or landfills where they will not degrade within one year.  The claim is, therefore, deceptive.

g.   <u>Free-Of Claims</u>: It is deceptive to misrepresent, directly or by implication, that a product, package, or service is free of, or does not contain or use, a substance. A truthful claim that a product, package, or service is free of, or does not contain or use, a substance may nevertheless be deceptive if: (1) the product, package, or service contains or uses substances that pose the same or similar environmental risks as the substance that is not present; or (2) the substance has not been associated with the product category. [17]

   i.  Example: A package of t-shirts is labeled "Shirts made with a chlorine-free bleaching process." The shirts, however, are bleached with a process that releases a reduced, but still significant, amount of the same harmful byproducts associated with chlorine bleaching.  The claim overstates the product's benefits because reasonable consumers likely would interpret it to mean that the product's manufacture does not cause any of the environmental risks posed by chlorine bleaching.

h.   <u>Non-Toxic Claims:</u> It is deceptive to misrepresent, directly or by implication, that a product, package, or service is non-toxic.  A non-toxic claim likely conveys that a product, package, or

---

[17] 16 C.F.R. § 260.9.

COMPLAINT

service is non-toxic both for humans and for the environment generally. Therefore, marketers making non-toxic claims should have competent and reliable scientific evidence that the product, package, or service is non-toxic for humans and for the environment or should clearly and prominently qualify their claims to avoid deception.

    i. Example: A marketer advertises a cleaning product as "essentially non-toxic" and "practically non-toxic." The advertisement likely conveys that the product does not pose any risk to humans or the environment, including household pets. If the cleaning product poses no risk to humans but is toxic to the environment, the claims would be deceptive.

i. <u>Ozone-Safe Claims:</u> It is deceptive to misrepresent, directly or by implication, that a product, package, or service is safe for, or friendly to, the ozone layer or the atmosphere.

    i. An aerosol air freshener is labeled "ozone-friendly." Some of the product's ingredients are volatile organic compounds (VOCs) that may cause smog by contributing to ground-level ozone formation. The claim likely conveys that the product is safe for the atmosphere as a whole, and, therefore, is deceptive.

j. <u>Recyclable Claims:</u> It is deceptive to misrepresent, directly or by implication, that a product or package is recyclable. A product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item.

    i. Example: A nationally marketed plastic yogurt container displays the Resin Identification Code (RIC) (which consists of a design of arrows in a triangular shape 6 containing a number in the center and an abbreviation identifying the component plastic resin) on the front label of the container, in close proximity to the product name and logo. This conspicuous use of the RIC constitutes a recyclable claim. Unless recycling facilities for this container are available to a substantial majority of consumers or communities, the manufacturer

should qualify the claim to disclose the limited availability of recycling programs.

44. The Green Guides also provide additional examples of marketing claims to "provide the Commission's views on how reasonable consumers likely interpret certain claims."[18]  The FTC provided the following relevant examples:[19]

- The brand name "Eco-friendly" likely conveys that the product has far reaching environmental benefits and may convey that the product has no negative environmental impact.  Because it is highly unlikely that the marketer can substantiate these claims, the use of such a brand name is deceptive.

- A brand name like "Eco-safe" would be deceptive if, in the context of the product so named, it leads consumers to believe that the product has environmental benefits which cannot be substantiated by the manufacturer. The claim would not be deceptive if "Eco-Safe" were followed by clear and prominent qualifying language limiting the safety representation to a particular product attribute for which it could be substantiated, and provided that no other deceptive implications were created by the context.

- A product label contains an environmental seal, either in the form of a globe icon, or a globe icon with only the text "Earth Smart" around it. Either label is likely to convey to consumers that the product is environmentally superior to other products. If the manufacturer cannot substantiate this broad claim, the claim would be deceptive. The claims would not be deceptive if they were accompanied by clear and prominent qualifying language limiting the environmental superiority representation to the particular product attribute or attributes for which they could be substantiated, provided that no other deceptive implications were created by the context.

- A marketer states that its packaging is now "Greener than our previous packaging." The packaging weighs 15% less than previous packaging, but it is not recyclable, nor has it been improved in any other material respect. The claim is deceptive because reasonable consumers likely would interpret "Greener" in this context to mean that other significant environmental aspects of the packaging also are improved over previous packaging.

- A marketer advertises a cleaning product as 'essentially non-toxic' and 'practically non-toxic.' The advertisement likely conveys that the product does not pose any risk to humans or the environment, including household pets.  If the cleaning product poses no risks to humans but is toxic to the environment, the claims would be deceptive.

---

[18] 16 C.F.R. § 260.1(d).
[19] 16 C.F.R. § 260.1.

COMPLAINT

**Consumers and Green Products**

45.     Consumers are regularly choosing more environmentally friendly products.  In fact, some consumers are changing their buying behavior to reduce the impact of their consumption habits over the environment, choosing an environment-friendly consumption behavior, often called green consumption. [20]

46.     Consumers and investors increasingly care about a business' positive impact and will make decisions according to brand perceptions.  In a 2019 CSR Survey conducted by Aflac, 77% of consumers felt motivated to make purchasing decisions from companies committed to making the world a better place and 73% of investors viewed these efforts as contributors to return on investment, and, in turn, often look favorably on companies with conscious social and environmental impact.

47.     In 2021, GreenPrint's Business of Sustainability Index, found that 64% of Gen X consumers would spend more on a product if it comes from a sustainable brand, and that figure jumps to 75% among millennials.

48.     Today, consumers across all generations—from Baby Boomers to Gen Z—are willing to spend more for sustainable products, and the percentages of consumers in those generations willing to pay more for sustainable products is growing.  Now, at least 90% of Gen X consumers said that they would be willing to spend an extra 10% or more for sustainable products.[21]

49.     An international study of 20,000 customers by grocery brand

---

[20] "Greenwashing effect, attitudes, and beliefs in green consumption," EMERALD INSIGHT, Mar. 12, 2019, https://www.emerald.com/insight/content/doi/10.1108/RAUSP-08-2018-0070/full/html, (Mar. 21, 2023).

[21] Greg Petro, "Consumers Demand Sustainable Products and Shopping Formats," FORBES, Mar. 11, 2022, https://www.forbes.com/sites/gregpetro/2022/03/11/consumers-demand-sustainable-products-and-shopping-formats/?sh=551188856a06, (Mar. 21, 2023).

COMPLAINT

giant Unilever identified one in three (33%) people were choosing to buy from brands they believe are doing environmental good.[22]

50.     A desire to help the environment is the primary reason consumers purchase sustainable products and brands.  Almost 30% say they want to improve the environment, with 23% wishing to reduce production waste, 22% wishing to reduce their carbon footprint, and 17% concerned with animal welfare.[23]  Consumers care about the environment and are purchasing environmentally sound products to support those interests.

51.     Consumers are also concerned about safety and an inclination towards safer products is guiding consumer choices.  A recent survey found that "[w]hen asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free from certain toxic chemicals (70%)."[24]

52.     Green labels and product marketing impact consumer buying decisions. Marketing and labels allow consumers to make comparisons among products and services in the category and decide their preference.[25]  Indeed, labels make is easier for consumers to identify green products when they are shopping, reducing consumers' purchase time.  Consumers consider the information related to the environmental attributes of products that companies, like Defendant, put on their

---

[22] "Climate explained: are consumers willing to pay more for climate-friendly products?" THE CONVERSATION, Sept. 29, 2020, https://theconversation.com/climate-explained-are-consumers-willing-to-pay-more-for-climate-friendly-products-146757, (Mar. 21, 2023).
[23] Id.
[24] Made Safe, "What Shoppers Want: Safe & Healthy Products," hhttps://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf (Mar. 21, 2023).
[25] "Marketing & Sustainability," MAJOR SUSTAINABILITY, PENN STATE, https://majorsustainability.smeal.psu.edu/green-labelling/, (Mar. 21, 2023).

label and use that information to make a purchase decision.[26]  Thus, labels and green marketing tactics, like those used by Defendant, impact consumer buying behavior.

53.    For these reasons, companies like Defendant have expanded their marketing efforts to attract consumers into purchasing cookware marked "non-toxic" and "free from" various chemicals.

**C.    Poly-fluoroalkyl Substances ("PFAS") and Cookware**

54.    PFAS are a series of chemicals that studies have linked to harmful side effects.

55.    PFAS chemicals are a class of more than 4,700 man-made chemical compounds that have a characteristic per fluorinated carbon monitory that confers hydrophobic chemical properties and environmental persistence.  PFAS are known as "forever chemicals" because they do not easily break down in the human body or the environment, and thus, persist over long periods of time.  Their characteristic benefits—including persistence and hydrophobic properties—propelled their use in thousands of products, including personal care products, fabrics, carpets, cookware, food packaging, and other commercial uses.[27]

56.    PFAS chemicals are dangerous to humans.   Exposure to PFAS chemicals is associated with an elevated risk for certain cancers, liver and kidney failures, immunological problems, and reproductive and developmental harm.  Indeed, "[M]eta-analyses point to a high toxicity and potentially bioaccumulative

---

[26] "The Effect of Green Marketing Strategy on Purchasing Decisions: A Review of Previous Research," INTERNATIONAL JOURNAL OF SCIENTIFIC & TECHNOLOGY RESEARCH VOLUME 8, ISSUE 12, Dec. 2019, https://www.ijstr.org/final-print/dec2019/The-Effect-Of-Green-Marketing-Strategy-On-Purchasing-Decisions-A-Review-Of-Previous-Research.pdf, (Mar. 21, 2023).

[27] Heather D. Whitehead, et al., "Fluorinated Compounds in North American Cosmetics," ENVIRON. SCI. & TECHNOL. LETT. Jun. 15, 2021, https://pubs.acs.org/doi/suppl/10.1021/acs.estlett.1c00240/suppl_file/ez1c00240_si_001.pdf, (Mar. 21, 2023).

properties of some metabolites of" PFAS chemicals.[28]  All PFAS contain carbon-fluorine bonds—one of the strongest in nature—making PFAS very persistent in the environment and in human bodies.[29]

57.   A recent New York Times article discussed the effect of PFAS exposure to pregnant women and babies, explaining the effects of PFAS on metabolism and immunity:[30]

> [s]cientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> 'And while we understandably focus on highly contaminated communities,' Dr. Lanphear said, 'we can predict based upon all the other evidence, that there's unlikely to be any safe level.'

58.   The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[31]

59.   "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science

---

[28] *Id.*

[29] Jessian Choy, "My Menstrual Underwear has Toxic Chemicals in It," SIERRA, Jan. 7, 2020, https://www.sierraclub.org/sierra/ask-ms-green/my-menstrual-underwear-has-toxic-chemicals-it, (Mar. 21, 2023).

[30] "These Everyday Toxins May be Hurting Pregnant Women and Their Babies," THE NEW YORK TIMES, https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html, (Mar. 21, 2023).

[31] "What are the health effects of PFAS?" AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, https://www.atsdr.cdc.gov/pfas/health-effects/index.html, (Mar. 21, 2023).

Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[32]

60.     The current Environmental Protection Agency's health advisory for PFAS limit PFAS for safe consumption to just 70 nanograms per liter.[33]  PFAS can be harmful at a very, very low concentration.

61.     This is especially true when PFAS are used in a manner that makes them absorbable or inhalable by humans, such as through cookware.

62.     That PFAS are harmful to the human body is beyond dispute.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[34]

63.     The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[35]

64.     In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

---

[32] "The Madrid Statement," GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/, (Mar. 21, 2023).
[33] "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," DUKE UNIVERSITY, NICHOLAS SCHOOL OF THE ENVIRONMENT, Jan. 5, 2022, https://nicholas.duke.edu/news/high-levels-pfas-foundanti-fogging-sprays-and-cloths, (Mar. 21, 2023).
[34] "PFAS Explained," ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/pfas/pfas-explained, (Mar. 21, 2023).
[35] *See supra*, fn. 39, https://www.atsdr.cdc.gov/pfas/health-effects/index.html

65.     Additionally, PFAS pose a risk to the environment, where once introduced, can quickly spread around the globe through multiple pathways.[36]

**D.     HexClad's Business And "Green" Representations**

66.     Defendant makes several representations to consumers claiming its pans are both PFOA free and free from PFAS.

67.     Defendant represents on its packaging that the pans are "PFOA Free".



HexClad Cookware box                                      [37]

68.     Defendant advertises and sells HexClad Cookware online via its own website and through third party websites like Amazon and Walmart.   Below are some examples of the HexClad Cookware for sale.

---

[36] "What are PFAS?" PFAS Free, https://www.pfasfree.org.uk/about-pfas (Mar. 21, 2023).

[37] https://moderncastle.com/hexclad-review/ (last visited June 12, 2023).

COMPLAINT

69.     HexClad's Website:



COMPLAINT

70.     On the HexClad website, as demonstrated above, HexClad classifies its pans as non-toxic.   HexClad also makes the following representations on the Frequently Asked Questions page of the HexClad website.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



hexcladcommercial.com/pages/frequently-asked-questions#:~:text=We%20do%20not%20use%20PFOA,nonstick%20pans%20a%20bad%20name.

**HEXCLAD** HYBRID COMMERCIAL COOKWARE

HOME   PRODUCTS   TECHN

# FREQUENTLY ASKED QUESTIONS

**Q: What is covered under my Lifetime Warranty?**
A: If anything impairs the functionality of the pan we will replace the pan! The only things not covered are cosmetic-like stains or minor surface scratches. If the pan fails to perform, we will send you a new one!

**Q: Are your pans free of PTFE?**
A: Our pans are PFOA free but contain some PTFE. PTFE is in over 95% of all nonstick cookware including our ceramic-based nonstick. PTFE is safe and inert. In fact, it is used in surgical matches meshes, dental implants and heart stents which are all implanted in the body. We do not use PFOA chemicals and other chemicals that gave many other nonstick pans a bad name. Why do we use some PTFE? Sadly, non-PTFE nonstick cookware does not work well for long periods of time. In fact, in our tests, the largest non-PTFE nonstick in the world only held up for 45 minutes of consecutive use.

**Q: What is the nonstick material in your pans?**
A: We use one of the highest grade Japanese ceramic non-stick coatings. It is infused with diamond dust to increase durability.

**Q: Where are your pans manufactured?**
A: HexClad products are designed at our headquarters in Los Angeles and manufactured in Asia. Our factory has the rare expertise needed to execute the complexities of our unparalleled, patented laser etching process. All HexClad products are backed by a lifetime warranty.

**Q: I just cooked for the first time and things seem to be sticking to the pan. How do I fix this?**
A: As with most fine cookware, HexClad cookware should be seasoned before first use. You do not need to season your pans before every use. To season your pans properly, first heat your pan to medium-low and spread 1 teaspoon of vegetable oil around the interior of the pan. Leave on heat for 1-2 minutes. Now you're ready to cook. Simple as that! Over the first few weeks of use, your HexClad Hybrid cookware will perform better and better as it re seasons itself on its own from the fats in the food you are cooking.

**Q: My pans seem to be a bit stained after use. How can I get them out?**
A: Some pan discoloration is normal with any cookware! For tougher stains, we recommend soaking your pans in warm soapy water for a few minutes. Depending on how tough the stain is, we recommend using Barkeepers friend or even stainless steel scouring pads to scrub off tough stains.

10:56 AM
4/26/2023

18
19
20
21
22
23
24
25
26
27
28

71.     HexClad's response to the Frequently Asked Questions represent that the HexClad Cookware is free from PFOAs and all PFAS.  HexClad admits that its cookware contain PFTE, but claims that PFTE is safe.

72.     Amazon sells HexClad cookware and below is a screen shot from Amazon's website.

COMPLAINT

Home & Kitchen › Kitchen & Dining › Cookware › Pots & Pans › Woks & Stir-Fry Pans

**HexClad 12 Inch Hybrid Stainless Steel Wok with Stay Cool Handle, Dishwasher and Oven Safe, Works with Induction, Ceramic, Non-Stick, Electric, and Gas Cooktops**

Visit the HexClad Store
4.6 ★★★★☆ ▾   958 ratings

-22% $139⁹⁹

List Price: $179.00 ⓘ

FREE Returns ▾

Get $60 off instantly: Pay $79.99 upon approval for Amazon Visa. No annual fee.

Available at a lower price from other sellers that may not offer free Prime shipping.

| Brand | HexClad |
|---|---|
| Material | Stainless Steel |
| Special Feature | Gas Stovetop Compatible, Electric Stovetop Compatible, Induction Stovetop Compatible |
| Color | Silver |
| Capacity | 1 Quarts |

**About this item**
- HexClad combines high-quality stainless steel with a laser-etched non-stick surface using our patented hexagonal design to provide the ideal hybrid cooking performance. Utilizing a tri-ply construction, our cookware has a layer of aluminum encapsulated between two layers of stainless steel for perfect heat distribution.
- The HexClad 12 inch Wok is completely non-toxic and PFOA-free. The cooking surface is a combination of ceramic, diamond dust, and stainless steel for the best balance of utility and performance.
- HexClad Cookware is ready for any kitchen, thanks to compatibility with all types of cooktops including induction, gas, electric, and ceramic, as well as being oven-safe up to 500 degrees Fahrenheit. Please note all HexClad Lids are only safe up to 400 degrees Fahrenheit.
- Keeping your HexClad Cookware looking clean is a breeze; the surface is metal-utensil resistant to avoid scratches and can be cleaned with steel wool pads and scouring. In addition, all HexClad Cookware is dishwasher-friendly (though hand-washing is highly recommended).
- Your purchase includes one HexClad 12 inch Wok. The 12 inch Wok measures approximately 11.8 inches at its upper diameter, 5.9 inches at its bottom diameter, 3.5 inches in height, and 2 kilograms in weight.

38

---

38 https://www.amazon.com/HexClad-Hybrid-Stainless-Stay-Cool-Handle/dp/B07W99LJBZ/ref=asc_df_B07W99LJBZ/?tag=hyprod-20&linkCode=df0&hvadid=366430912073&hvpos=&hvnetw=g&hvrand=6952101780741136727&hvpone=&hvptwo=&hvqmt=&hvdev=c&hvdvcmdl=&hvlocint=&hvlocphy=9026906&hvtargid=pla-811760919119&psc=1&tag=&ref=&adgrpid=79166366634&hvpone=&hvptwo=&hvadid=366430912073&hvpos=&hvnetw=g&hvrand=6952101780741136727&hvqmt=&hvdev=c&hvdvcmdl=&hvlocint=&hvlocphy=9026906&hvtargid=pla-811760919119 (last visited June 2, 2023).

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

73.     The Amazon screenshot above shows that Defendant is representing the HexClad 12-inch Wok as completely non-toxic and PFOA-free.

74.     Walmart sells HexClad Cookware and below is a screen shot from Walmart's website:



39

75.    The Walmart screenshot above shows that Defendant is representing HexClad Cookware as 100% PFOA Free.

76.    In 2023, Defendant also made several representations about its products being free from PFOA and PFAS, including the following social media posts, as well:



COMPLAINT



**arthur fleiss** @arthurfleiss · Mar 22
What makes them hybrid?

💬 1    �recycle    ♡ 2    ‖ 2,001    ⬆

**HexClad** ✔ @hexclad · Mar 23
Our pans are coated with a non toxic, PFOA free (ree from all PFAS) non-stick coating. Moreover, our patented laser\-etched stainless steel hexagon design is raised above the non-stick surface which protects it and allows you to use metal utensils without scratching or chipping.

💬    ↺    ♡ 4    ‖ 1,890    ⬆

**IfNotNowWhen** @PurePatriotDNA · Apr 8
Do they cool better on gas or electric?
Does the buyer need to worry about getting toxic poisoning - as in aluminum-if that's toxic?
Are they heavy – as in a let's say 60yr old woman, making a pot of pasta and needs to empty into sink?

💬 2    ↺    ♡ 1    ‖ 518    ⬆

**HexClad** ✔ @hexclad · Apr 9
Hi! They function in the same way for both gas and electric.

Our cookware is built with a tri-ply construction where we sandwich a layer of aluminum (heating element) between two layers of high-grade stainless steel. The aluminum never comes in contact with your food.

💬 1    ↺    ♡ 2    ‖ 241    ⬆

**Marcus Orealist** @JoeDeo5 · Apr 10
what is the nonstick coating? nobody wants to answer this, I asked google.

💬 1    ↺    ♡    ‖ 24    ⬆

**HexClad** ✔ @hexclad · Apr 10
Our cookware is built with a layer of aluminum (heating element) between 2 layers of high-grade stainless steel. The aluminum never comes in contact with your food. Our pans are coated with a non toxic, PFOA free (and free from all PFAS) non-stick coating.

💬 1    ↺    ♡ 1    ‖ 44    ⬆

**Marcus Orealist** @JoeDeo5 · Apr 10
but you won't tell me the non-stick contents very suspicious.

💬    ↺    ♡ 1    ‖ 11    ⬆

Just now   Like   Reply

29

COMPLAINT



77.    Additionally, HexClad makes the following representations on the questions and answers section on Amazon for the HexClad Cookware.

**Looking for specific info?**

> 🔍 Search in reviews, Q&A...

**Customer questions & answers**

3 votes

**Question:** Are the materials non-toxic?

**Answer:** Google: Although in its polymeric form, PTFE is considered to be non-toxic and physiologically inert, with the rise in temperature greater than 260 °C, and PTFE resin produces polymer fumes into the working environment. With further increase in temperature to 350 °C, the fumes can cause polymer fume fever in exposed workers.
By Galina G. on August 16, 2022

Our non-stick is non-toxic and completely safe, it does not contain any PFOA or PFAS, cadmium, or lead. It does contain PTFE which is widely used in medical settings including permanent and temporary medical devices implanted in the human body, and is thus completely safe.
By Hexclad Hybrid Cookware SELLER  on October 4, 2021

[40]

78.    The above figure from Amazon's Customer Questions and Answers includes a response from HexClad in which HexClad represents its cookware does

---

[40] https://www.amazon.com/HexClad-Hybrid-Stainless-Frying-Stay-Cool/dp/B07WLQTCRH/ref=sr_1_2?crid=4TQV3X2STDC5&keywords=HexClad%2B10-inch%2BHybrid%2BPan&qid=1684939790&sprefix=hexclad%2B10-inch%2Bhybrid%2Bpan%2Caps%2C102&sr=8-2&ufe=app_do%3Aamzn1.fos.f5122f16-c3e8-4386-bf32-63e904010ad0&th=1 (last visited May 24, 2023).

not contain any PFOA or PFAS and also representing PTFE is used in medical settings, without disclosing that in medical settings the PTFE would not be heated to high temperature like it is in HexClad Cookware.  Heating PTFE to high temperatures, such as temperatures needed to cook steak, may change the composition of the chemical and may increase its hazard.[41]  These representations that Defendant makes to Amazon customers are misleading to consumers, including Plaintiffs, and consumers have been impacted and damaged by Defendant's non-toxic and "free from" claims about the HexClad Cookware.

79.     Many of the claims Defendant makes about its cookware are—at best—misleading.  For example, HexClad claims that its cookware is "free from harmful PFOA/C8 (and all PFAS) chemicals.  Yet, the non-stick coating is made with PTFE, a known PFAS which likely has measurable amounts of PFOA in the PTFE coating, as well.

## CLASS ALLEGATIONS

80.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of all others similar situated, as representative of the following Nationwide Class:

**Nationwide Class:**

All citizens of the United States who purchased HexClad Cookware.

81.     Excluded from the Class are Defendant; its officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and

---

[41] *The Problem with Teflon and Other Non-Stick Pots and Pans*, LEAFSCORE, https://www.leafscore.com/eco-friendly-kitchen-products/the-problem-with-teflon-and-other-non-stick-pots-and-pans/#:~:text=PTFE%20starts%20to%20dissociate%20at,be%20released%20into%20the%20air. (last visited June 20, 2023).

Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

82. Plaintiffs reserve the right to modify and/or amend the Class definition, including but not limited to creating additional subclasses, as necessary.

83. All members of the proposed Class are readily identifiable through Defendant's records.

84. **Numerosity.** The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class includes millions of people. The precise number of Class members is unknown to Plaintiff but may be ascertained from Defendant's records.

85. **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiff and Class members, which predominate over any questions only affecting individual Class members. These common legal and factual questions include, without limitation:

    a. Whether Defendant engaged in unlawful, unfair, or deceptive business practices by advertising and selling the HexClad Cookware;

    b. Whether Defendant's conduct of advertising and selling the HexClad Cookware as non-toxic and free from certain chemicals when they are not constitutes an unfair method of competition, or unfair or deceptive act or practice in violation of various consumer protection laws and the warranties related to the products;

    c. Whether Defendant used deceptive representations and omissions in connection with the sale of the HexClad Cookware in violation of various consumer protection laws and the

1      warranties related to the products;

2      d.      Whether Defendant represented the HexClad Cookware has
3              characteristics or quantities that they do not have in violation of
4              various consumer protection laws and the warranties related to
5              the products;

6      e.      Whether Defendant advertised the HexClad Cookware with the
7              intent not to sell it as advertised in violation of various consumer
8              protection laws and the warranties related to the products;

9      f.      Whether Defendant's labeling and advertising of the HexClad
10             Cookware is untrue or misleading in violation of various
11             consumer protection laws and the warranties related to the
12             products;

13     g.      Whether Defendant knew or by the exercise of reasonable care
14             should have known its labeling and advertising was and is untrue
15             or misleading in violation of various consumer protection laws
16             and the warranties related to the products;

17     h.      Whether Plaintiff and the Class purchased HexClad Cookware
18             they would not have purchased or paid more money for the
19             HexClad Cookware than they would have had Defendant not
20             engaged in the misrepresentations and omissions described
21             herein;

22     i.      Whether Defendant's conduct constitutes breach of express
23             warranty;

24     j.      Whether Plaintiff and the Class are entitled to equitable and/or
25             injunctive relief; and

26     k.      Whether Defendant was unjustly enriched by its unlawful
27             conduct.

28

86.     **Typicality.**  Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of himself and the Class. Defendant's unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.  Plaintiff's and the Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

87.     **Adequacy.**  Plaintiff will fairly and adequately represent and protect the interest of the members of the Class and has retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

88.     **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Breach of Express Warranty**

89.     Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

90.     Each of the named Plaintiffs bring this cause of action against

COMPLAINT

Defendant on behalf of the Nationwide Class.

91.     Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain.  Such warranties can also be created based upon descriptions of the goods that are made as part of the basis of the bargain that the goods shall conform to the description.

92.     Each of the Plaintiffs formed a contract with Defendant at the time they purchased the HexClad products.  The terms of that contract include the claims and affirmations of fact that Defendant made on the HexClad product's packaging and through marketing and advertising, including, but not limited to, claims that the products are "non-toxic," "metal-utensil safe," and other safety claims described above.

93.     The marketing and advertising constitute express warranties and became a part of the basis of the bargain, and they are part of the standardized contracts between Plaintiffs and Class Members on the one hand, and Defendant, on the other.

94.     In addition, or in the alternative, to the formation of an express contract, Defendant made each of their above-described representations, including the "non-toxic" and other safety claims described above, to induce Plaintiffs and Class Members to rely on such representations.

95.     Defendant's claims were material, and Plaintiffs and Nationwide Class Members did rely and were reasonable in relying upon such representations in making their purchases of the HexClad cookware products.

96.     Defendant has breached its express warranties about the HexClad cookware products because the representations set forth herein, including the "non-toxic" and other safety claims described above, are false and misleading.

97.     Defendant failed to ensure that the material representations it made—

and continues to make—to consumers were true.  As a result of this systemic failure of oversight to ensure the truthfulness of the representations of the product label and relevant marketing and advertising, consumers purchased the HexClad cookware products from a company that fails to disclose or otherwise conceals that its products contain potentially hazardous chemicals, such as PFAS and traces of PFOA in the PFTE non-stick coating.

98.   Defendant cannot make the claims that its HexClad cookware products are "non-toxic" and/or "PFOA-free" when it utilizes PFAS chemicals, such as PTFE, in the manufacturing of its HexClad cookware.  Defendant cannot verify whether its "non-toxic" claims are accurate, nor did Defendant verify these claims through adequate oversight. Accordingly, Defendant convinced consumers to purchase the HexClad cookware products and ultimately charged consumers a price premium for express—but empty—promises.

99.   Defendant breached its express warranties about the HexClad cookware because the representations as set forth herein were false and misleading.

100.   Plaintiffs and Nationwide Class Members expected and would have been reasonable in expecting that Defendant ensure the statements on the HexClad label and the relevant marketing and advertising for the product were truthful regarding its "non-toxic" and other safety claims.   However, Plaintiffs and Nationwide Class Members have not received the benefit of their bargain, as it has been discovered that Defendant's "non-toxic" and other safety claims are false and misleading.

101.   As a result of Defendant's breach of its express warranties, Plaintiffs and the Nationwide Class Members were damaged in an amount to be proven at trial.

102.   Plaintiffs, on behalf of themselves and Class Members, pray for relief as set forth below.

### SECOND CLAIM FOR RELIEF
#### Negligent Misrepresentation

103.   Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

104.   Defendant represented to Plaintiffs and the Class Members that its HexClad cookware products were "non-toxic," "metal-utensil safe," free of PFOA and all PFAS, and other safety claims outlined above.

105.   At the time Defendant made these representations, it knew or should have known that these representations were false, misleading to consumers, or otherwise made without knowledge of their truth or veracity.

106.   At a minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the HexClad cookware.

107.   The negligent misrepresentations and omissions Defendant made, upon which Plaintiffs and the Class Members reasonably and justifiably relied, were intended to induce and actually did induce Plaintiffs and the Class Members to purchase the HexClad cookware.

108.   Plaintiffs and the Class Members would not have purchased the HexClad cookware or would have purchased the HexClad cookware under different terms, if the true facts had been known.

109.   Defendant's negligent actions caused harm to Plaintiffs and the Class Members, who are entitled to damages and other legal and equitable relief as a result.

### THIRD CLAIM FOR RELIEF
#### Violation of the California Consumer Legal Remedies Act
#### California Civil Code § 1750, *et seq.*

110.   Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

111.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA"), by Plaintiffs on behalf of the Nationwide Class.

112.   Defendant's actions, representations, omissions, and conduct have violated, and continue to violate the CLRA because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

113.   Plaintiffs and the other members of the class are "consumers" as that term is defined by the CLRA.[42]

114.   The products that Plaintiffs and similarly situated members of the class purchased are "goods" within the meaning of the CLRA.[43]

115.   By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, as described above, Defendant has violated, and continues to violate §§ 1770(a)(4), 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA.   In violation of California Civil Code § 1770(a)(4), Defendant used deceptive representations in connection with goods.   In violation of California Civil Code § 1770(a)(5), Defendant represented that goods have approval, characteristics, uses, benefits, and qualities that they do not have.   In violation of California Civil Code § 1770(a)(7), Defendant's acts and practices constitute improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another.   In violation of California Civil Code § 1770(a)(9), Defendant advertised goods with intent not to sell them as advertised.

116.   Specifically, Defendant's acts and practices led consumers to believe that the HexClad cookware products were, variously and without limitation, "non-toxic," "metal-utensil safe," and "PFOA-free," when in fact, the products contain a PTFE chemical coating and may contain other PFAS.   Defendant additionally made false and/or deceptive representations and statements (by omission and commission) that led reasonable consumers to believe that the products were safe for their health

---

[42] CAL. CIV. CODE § 1761(d).
[43] *Id.* § 1761(a).

and constructed without harmful chemicals, such as PFOA and other PFAS chemicals.

117.   Further, Defendant omitted material facts that it had a duty to disclose, as alleged above.  Specifically, HexClad failed to disclose that its non-stick coating contained PTFE which is a PFAS and may contain traces, or more, of PFOAs.

118.   Defendant's concealment of the true characteristics of the products was material to Plaintiffs and the Class Members.  Had they known the truth, Plaintiffs and the Class Members would not have purchased the products or would have paid significantly less for them.

119.   Defendant, as explained above, had an ongoing duty to Plaintiffs and the Class Members to refrain from unfair and deceptive practices under the CLRA. Specifically, Defendant owed Plaintiffs and the Class Members a duty to disclose material facts concerning the products because it possessed exclusive knowledge, it intentionally concealed them from Plaintiffs and Class Members, and/or it made partial representations that were misleading since it concealed the aforementioned facts.

120.   Plaintiffs and Class Members had no reasonable means of learning the facts that Defendant has concealed or failed to disclose because they were unaware of the manufacturing process for Defendant's products.  Furthermore, Defendant misrepresented, or at least omitted, a key part of that manufacturing process, which was the introduction of synthetic chemicals to the cookware.

121.   Plaintiffs and Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

122.   Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to the

CLRA.[44]  If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and other Class Members will continue to suffer harm.

123.   On June 28, 2023, Plaintiffs provided Defendant with notice and a demand on behalf of themselves and all others similarly situated that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein.  Plaintiffs have received no response.

### FOURTH CLAIM FOR RELIEF
**Violation of the California False Advertising Law**
**California Business and Professions Code § 17500, *et seq*.**

124.   Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

125.   This cause of action is brought pursuant to the California False Advertising Law, California Business and Professions Code § 17500, *et seq*. ("FAL"), by Plaintiffs on behalf of the Nationwide Class.

126.   Beginning at an exact date unknown to Plaintiffs, but since at least as early as the time of the first Plaintiff's purchase and continuing until today, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the HexClad cookware products, and, in particular, those advertised as, variously and without limitation, "non-toxic," "metal-utensil safe," and "PFOA-free."

127.   As set forth herein, Defendant has made representations and statements (by omission and commission) that led reasonable consumers to believe that that the HexClad cookware products were, variously and without limitation, "non-toxic," "metal-utensil safe," and "PFOA-free," when in fact, the products contain a PTFE chemical coating.   Defendant additionally made false and/or deceptive representations and statements (by omission and commission) that led reasonable

---

[44] *Id.* § 1780(a)(3).

consumers to believe that the products were safe for their health and constructed without harmful chemicals, such as PFOA and other PFAS chemicals.

128.  Plaintiffs and those similarly situated relied to their detriment on Defendant's false, misleading, and deceptive advertising and marketing practices. Had Plaintiffs and the Class Members been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, paying less for the HexClad products.

129.  Defendant's acts and omissions were likely to deceive the general public.

130.  Defendant engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising in violation of the FAL.

131.  The aforementioned practices, which Defendant has used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

132.  Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.  Even for those who did not buy the HexClad products directly from Defendant, a certain amount of money flowed from Class Members who purchased the products through retailers to Defendant.  Plaintiffs seek restitution of all amounts so recoverable.

133.  If Plaintiffs and Class Members claims at law fail, Plaintiffs, those similarly situated, and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered.  Plaintiffs

seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein.

134.   Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading, and deceptive advertising, and injunctive relief restraining Defendant from engaging in any such advertising and marketing practices in the future.  Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled.  Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the FAL alleged to have been violated herein.

135.   As a direct and proximate result of such actions, Plaintiffs and the Class Members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Violation of the California Unfair Competition Law**
**California Business and Professions Code § 17200,** *et seq.*

136.   Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

137.   This cause of action is brought pursuant to the California Unfair Competition Law, California Civil Code § 17200, *et seq.* ("UCL"), by Plaintiffs on behalf of the Nationwide Class.

138.   Defendant has engaged in, and continues to engage in, unfair, unlawful, and deceptive trade practices in California by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendant has engaged in, and continues to engage in, unfair, unlawful and deceptive trade practices by, without limitation, the following:

      a.   engaging in misrepresentation and omissions as described herein;

      b.   violating the CLRA as described herein;

      c.   violating the FAL as described herein;

      d.   violating the California Safer Food Packaging and Cookware Act, California Health and Safety Code § 109010, *et seq.* ("SFPCA"), as described herein.

139.   Defendant, in its marketing, advertising, and labeling of the HexClad cookware products, made false and misleading statements and omissions regarding the quality and characteristics of the HexClad cookware, specifically, marketing and labeling the HexClad cookware as "non-toxic," "metal-utensil safe," and other safety claims described above when the HexClad cookware is actually manufactured with a synthetic chemical coating of PTFE.  Such claims and omissions appear on the label of the HexClad cookware products, product descriptions on online stores such as Amazon, Defendant's official website, and other advertisements.

140.   Plaintiffs and those similarly situated relied to their detriment on Defendant's unfair, deceptive, and unlawful business practices.  Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation, not paying for, or, at a minimum, paying less for the HexClad products.

141.   Defendant's labeling, marketing, and advertising of the HexClad cookware products led to, and continue to lead to, reasonable consumers, including

Plaintiffs and Class Members, believing that the HexClad cookware is "non-toxic," "metal-utensil safe," free from PFOA and other hazardous synthetic chemicals, and in conformity with other safety claims as described above.

142. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."[45]

143. Defendant does not have any reasonable basis for the claims about the HexClad cookware made in Defendant's marketing, advertising, and on Defendant's packaging or labeling because the HexClad cookware is not free from potentially hazardous and toxic substances, such as PFAS chemicals like PTFE. Defendant knew or should have known that the HexClad products are not "non-toxic," "metal-utensil safe," or free from hazardous synthetic chemicals of the same family as PFOAs, such as PTFE, yet Defendant intentionally advertised and marketed the HexClad cookware to deceive reasonable consumers into believe that the HexClad cookware products conformed to Defendant's safety representations, as described above.

144. In addition, Defendant's use of various forms of marketing and advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue, or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code §§ 17200 and 17531.

145. Defendant engaged in these unlawful, deceptive, and unfair practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices

---

[45] CAL. BUS. & PROF. CODE § 17200.

prohibited by the UCL.

146.    Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

147.    Defendant has engaged in unfair practices by violating the SFPCA, which provides, "a manufacturer shall not make a claim that the cookware is free of any specific chemical if the chemical belongs to a chemical group or class identified on the designated list, unless no individual chemical from that chemical group or class is intentionally added to the cookware."[46] Defendant represents that the HexClad cookware is "non-toxic" and free of PFOAs; however, the HexClad cookware, in fact, contains a synthetic chemical coating of PTFE, a chemical of the same family as PFOAs and PFAS substances, each of which are included on the California Department of Toxic Substances Control's designated list.

148.    In addition to the unlawful and deceptive acts described above, Defendant engaged in unfair practices by violating the Federal Trade Commission's guides against bait advertising.  16 C.F.R. §§ 238.1–4.  The policy provides that "No statement or illustration should be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another."[47]  Defendant's aforementioned acts violated this policy, including its representations that the HexClad cookware is "non-toxic," "metal-utensil safe," and other safety claims described above.

149.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provides an

---

[46] CAL. HEALTH & SAFETY CODE § 109013.
[47] 16 C.F.R. § 238.2(a).

unlawful advantage over Defendant's competitors as well as injury to the general public.

150.   As a direct and proximate result of such actions, Plaintiffs and the Class Members have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial.

151.   The injuries to Plaintiffs and Class Members resulting from Defendant's unfair business practices outweigh any benefits.  Defendant's actions of marketing, advertising, and labeling the HexClad cookware as "non-toxic," "metal-utensil safe," and free of PFOAs does not confer any benefit to consumers when the consumers do not receive products commensurate with the consumers' reasonable expectations engendered by such false, misleading, and deceptive marketing and labeling.  Consumers cannot reasonably avoid the injuries caused by Defendant's deceptive labeling and advertising of the HexClad cookware. Accordingly, the injuries caused by Defendant's deceptive labeling, marketing, and advertising outweigh any benefits.

152.   If Plaintiffs' and Class Members' claims at law fail, Plaintiffs, those similarly situated and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered.

153.   Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

154.   Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from offering the Products within a reasonable time after entry of judgment. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to

violate the laws of California unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it was not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment

155.   Plaintiffs reassert the allegations set forth previously and incorporate such allegations by reference herein.

156.   Plaintiffs bring this claim for unjust enrichment against Defendant in the alternative to their breach of express warranty claim.

157.   Plaintiffs and Nationwide Class members conferred benefits on Defendant by purchasing the HexClad cookware products, including by paying a price premium for the HexClad cookware.

158.   Defendant has been unjustly enriched by retaining the revenues derived from Plaintiffs and the Nationwide Class Members' purchases of the HexClad cookware.   Retention of the monies under these circumstances is unjust and inequitable because Defendant's labeling of the HexClad cookware was misleading to consumers, which caused injuries to Plaintiffs and the Nationwide Class Members because they would not have purchased or would have paid less for the HexClad cookware if they had known the true facts regarding Defendant's "non-toxic" and other safety claims, as described above.

159.   Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Nationwide Class Members is unjust and inequitable, Plaintiffs and the Nationwide Class Members seek return of all monies Defendant acquired from its unlawful conduct, including disgorgement of all profits and

establishment of a constructive trust.

160.   Therefore, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.   Certification the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and an order that notice be provided to all Class Members;

b.   Designation of Plaintiffs as representatives of the Class and the undersigned counsel, Zimmerman Reed LLP and the Johnson Firm, as Class Counsel;

c.   An award of damages in an amount to be determined at trial or by this Court;

d.   An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e.   An award of statutory interest and penalties;

f.   An award of costs and attorneys' fees; and

g.   Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated: June 27, 2023

*/s/ Caleb Marker*
Caleb Marker (SBN 269721)
caleb.marker@zimmreed.com
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, California 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

48

COMPLAINT

Brian C. Gudmundson
(*pro hac vice* forthcoming)
Rachel K. Tack
(*pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com

Christopher D. Jennings
(*pro hac vice* forthcoming)
Tyler B. Ewigleben
(*pro hac vice* forthcoming)
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com

***Attorneys for Plaintiff***

COMPLAINT